IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

SAUER INCORPORATED, A           )
Pennsylvania Corporation,       )
                                )
      Plaintiff                 )
                                )
v.                              )    CASE NO. CV420-157
                                )
MCLENDON ENTERPRISES, INC., A   )
Georgia Corporation,            )
                                )
      Defendant.                )
_____  )

O R D E R

Before the Court is Defendant McLendon Enterprises,
Inc.'s, Motion for Summary Judgment. (Doc. 20.) For the
following reasons, Defendant's motion (Doc. 20) is **GRANTED.**[1]

**BACKGROUND**[2]

_____

[1] The case caption incorrectly lists Magruder Construction
Company as a defendant in this case. Defendant McLendon filed
a third-party complaint against Magruder, which it later
dismissed. (Docs. 8, 14.) However, Magruder was never a
primary defendant in this case. Accordingly, the Clerk of
Court is **DIRECTED** to amend the caption to remove Magruder as a
defendant in this case.

[2] The relevant facts are taken principally from the Defendant's
Statement of Material Facts (Doc. 22) and Plaintiff's response
thereto (Doc. 27). Pursuant to Federal Rule of Civil Procedure
56(e) and Southern District of Georgia Local Rule 56.1, all
material facts not controverted by specific citation to the
record are deemed admitted, unless otherwise inappropriate.
Where the parties offer conflicting accounts of the events in
question, this Court draws all inferences and presents all
evidence in the light most favorable to Plaintiff. See
Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316,
1318 (11th Cir. 2012) (citing Moton v. Cowart, 631 F.3d 1337,
1341 (11th Cir. 2011)).

Plaintiff Sauer Incorporated brings this claim for breach of contract related to Defendant's construction work at the Fort Stewart Elementary School in Fort Stewart, Georgia. (Doc. 1 at ¶ 1.) On or about June 3, 2011, Plaintiff entered a contract with the United States Army Corps of Engineers ("USACE") to perform construction work at the Fort Stewart Elementary School (the "Project"). (Doc. 22 at ¶ 1; Doc. 27 at ¶ 1.) On November 12, 2012, Plaintiff entered a subcontract with Defendant, in which Defendant agreed to undertake certain civil sitework for the Project (the "Subcontract"). (Doc. 22 at ¶ 2; Doc. 27 at ¶ 2.) Under the Subcontract, Defendant's scope of work included erosion control, site clearing, site demolition, earthwork, grading, utilities, roadways and parking lots. (Doc. 22 at ¶ 2; Doc. 27 at ¶ 2.)

Defendant's earthwork and grading scope of work included sub-grade preparation for pervious concrete sidewalks. (Doc. 1, Attach. 1 at 17.) Relevant to this case, Defendant agreed to provide compacted sub-grade and base course preparation for all areas to receive concrete and twenty-four inches of "sandy structural fill" for all areas to receive pervious concrete sidewalks. (Id. at 18.) Originally, Defendant did not agree under the Subcontract to install the actual sidewalks. (Id. at 23-24; Doc. 26 at ¶ 9; Doc. 27 at ¶ 3.) On July 22, 2013, Plaintiff and Defendant executed a change order which modified

2

Defendant's scope of work to include placement of the pervious concrete sidewalks, #57 stone base and geotextile fabric beneath the sidewalks. (Doc. 26 at ¶ 14.)

The date on which Defendant installed the sidewalks is unclear, but Plaintiff began to receive complaints from the USACE regarding the sidewalks in 2016.[3] On January 5, 2016, Susan Smith, USACE project engineer, advised Plaintiff via email that problems had developed with the sidewalks at the Project. (Doc. 22 at ¶ 5; Doc. 27 at ¶ 5; Doc. 21, Attach. 1 at 2.) Ms. Smith informed Plaintiff that the sidewalks had "heaved at the expansion joints in several places" and "[i]n other expansion joints the joint material ha[d] been squeezed out . . . ." (Doc. 21, Attach. 1 at 2.) Ms. Smith also stated that the problems with the sidewalks were "definitely a site wide issue and not just an isolated occurrence." (Id.) On January 13, 2016, David Warren, USACE area engineer, sent Plaintiff an email describing similar problems with the sidewalks and inquiring about the "status of [Plaintiff's] fix." (Doc. 21, Attach. 2 at 2.)

---

[3] Defendant contends that the sidewalks were installed in 2014, but Plaintiff denies this contention and objects under Federal Rule of Civil Procedure 56(c)(1)(A) because Defendant failed to cite to "particular parts of materials on the record" to support its assertion. (Doc 22. at ¶ 4; Doc 27 at ¶ 4.) Because the exact date the sidewalks were installed is not relevant to this case, the Court will assume they were installed sometime before 2016, when Plaintiff began to receive complaints about the sidewalks.

Plaintiff forwarded both emails to Defendant and requested that Defendant provide "immediate on-site review and response regarding this matter." (Doc. 21, Attach. 1 at 2; Doc. 21, Attach. 3 at 2.) On January 20, 2016, Plaintiff informed Defendant that Plaintiff would be inspecting the sidewalks and that Plaintiff intended to provide notice to Defendant's surety of the issue with the sidewalks "considering the possibility that [Defendant] may share responsibility in the matter." (Doc. 21, Attach. 3 at 2.) On April 22, 2016, Plaintiff advised Defendant that it had performed temporary remedial measures to alleviate the sidewalks' "heaving" and to remove the "ramps" in the sidewalks that the USACE had deemed unsafe. (Doc. 21, Attach. 4 at 2.) Plaintiff further advised Defendant that two testing firms would be conducting tests and analysis on the sidewalks. (Id.)

On April 26, 2016, Whitaker Laboratory, Inc., a testing firm retained by Plaintiff, issued a report titled "Subgrade Evaluation" which detailed its inspection of "near surface soils beneath the pervious concrete sidewalk" and opined on the soils' compliance with the provisions of the Subcontract. (Doc. 21, Attach. 5 at 2.) As part of the inspection, Whitaker Laboratory obtained soil samples up to a depth of twenty-four inches below the bottom of the pervious concrete and then

4

"visually classified" the samples. (Id.) Based on the results of its test, Whitaker Laboratory concluded that two of the three soil samples did not meet the requirements of "sandy select material" per the conditions of the Subcontract. (Id.) Whitaker Laboratory also stated that the "geotextile fabric beneath the gravel" appeared to consist of a woven fabric which "may not allow a fast enough permeability rate into the underlying soils." (Id. at 2-3.)

On June 17, 2016, TEC Services, Plaintiff's second testing firm, issued its report regarding the pervious concrete sidewalks at the Project site. (Doc. 21, Attach. 6 at 2; Doc. 22 at ¶ 13; Doc. 27 at ¶ 13.) TEC Services tested three core samples of the concrete from separate sections of the sidewalk, including a section that was exhibiting heaving, and evaluated the samples through "concrete petrography." (Doc. 21, Attach. 6 at 2; Doc. 22 at ¶ 14; Doc. 27 at ¶ 14.) The focus of TEC Services's evaluation was to determine if the expansion of the concrete was a result of an alkali-silica reaction (ASR) and if the curling was a result of insufficient curing. (Doc. 21, Attach. 6 at 2.) Based on its findings, TEC reported that the measured thickness of the concrete in all three samples was less than the four inches required in the project specifications. (Doc. 22 at ¶ 15; Doc. 27 at ¶ 15.) TEC concluded that "[t]he significantly heaved concrete

5

sidewalk at the joints and expansion which displaced the curbs is not a result of curling or an expansive subgrade" and that "ASR did not cause the expansion." (Doc. 21, Attach. 6 at 4.) TEC Services also found that the curling in the concrete may have been exacerbated by the thickness of the concrete being less than called for by the design specifications. (Id.)

On July 12, 2016, Whitaker Laboratory conducted further testing at the Project site, this time taking six core samples from various sections of the pervious concrete sidewalk. (Doc. 21, Attach. 8 at 2; Doc. 22 at ¶ 20; Doc. 27 at ¶ 20.) For all six samples, Whitaker Laboratory measured the thickness of the concrete and the thickness of the stone directly below the concrete sidewalks. (Doc. 21, Attach. 8 at 2.) Whitaker Laboratory's findings revealed that two of the samples had a concrete thickness of less than the four inches required by the Subcontract. (Id.; Doc. 22 at ¶ 21; Doc. 27 at ¶ 21.)

On July 1, 2016, Plaintiff sent Defendant and Hartford Fire Insurance Company, Defendant's surety, a notice of default. (Doc. 21, Attach. 7 at 2.) In the notice, Plaintiff states that, based on TEC Services's report, Defendant did not install the concrete sidewalks with the necessary thickness as required by the Subcontract. (Id. at 2-3.) Plaintiff also noted that TEC Services's report suggested that there may have been deficiencies in the curing process. (Id. at 3.) Plaintiff

6

further informed Defendant that its failure to timely commence repairs on the sidewalks placed it in default of its contractual obligations. (Id.) On July 15, 2016, Plaintiff advised Defendant and Hartford that, due to the lack of response to its notice of default, Plaintiff would be beginning remediation on the sidewalk, at Defendant and Hartford's cost, on July 18, 2016. (Doc. 26, Attach. 5 at 2-3.)

On September 15, 2016, Plaintiff sent Hartford another letter reiterating its position that Defendant had breached the Subcontract. (Doc. 26, Attach. 8 at 2, 5-6.) Plaintiff stated that Defendant's failure to install concrete of sufficient thickness "alone was sufficient to trigger [Defendant's] contractual obligation to remove and replace the concrete." (Id. at 6.) Plaintiff also detailed the costs it had incurred repairing the defective concrete sidewalks and made a claim for $66,439.01. (Id. at 8.) On February 3, 2017, Plaintiff sent Defendant and Hartford a final demand letter stating that "[Plaintiff] intend[ed] to initiate legal proceedings against both parties to recover the $66,439.01 in damages caused plus interest, attorneys' fees and costs." (Doc. 26, Attach. 10 at 2.)

On March 6, 2017, Plaintiff filed suit against Defendant and Hartford in the State Court of Toombs County (the "State

Suit").[4] (Doc. 21, Attach. 9; Doc. 22 at ¶ 22; Doc. 27 at ¶ 22.) In its complaint, Plaintiff alleged that "[Defendant] breached the terms of its Subcontract by failing to properly perform its scope of work at the Project, causing defects such as curling, expansion and heaving of the sidewalks in certain areas." (Doc. 21, Attach. 9 at ¶ 11; Doc. 22 at ¶ 23; Doc. 27 at ¶ 23.) Plaintiff further alleged that "[i]n addition, [Defendant] breached the terms of the Subcontract by failing to follow the Project design as to the required slab thickness for the sidewalks at the project." (Doc. 21, Attach. 9 at ¶ 12; Doc. 22 at ¶ 24; Doc. 27 at ¶ 24.) Plaintiff also alleged that "[Defendant] has materially breached the terms of the Subcontract by failing and refusing to properly perform its work at the Project, causing damages to [Plaintiff]." (Doc. 21, Attach. 9 at ¶ 14.) Based on Defendant's breach, Plaintiff sought an award of damages, costs and attorneys' fees. (Id. at ¶ 15.)

In August 2017, the Plaintiff, Defendant and Hartford finalized a settlement agreement (the "Settlement Agreement") by which Plaintiff agreed to release its claims against Defendant and Hartford in exchange for Defendant's payment of $46,500. (Doc. 22 at ¶ 28; Doc. 27 at ¶ 28; Doc. 21, Attach.

---

[4] Sauer Inc. v. McLendon Enters., Inc., et. al., Case No. 17SV00015 (Ga. St. Ct. Mar. 6, 2017).

10 at 2-3.) The Settlement Agreement's release provision
stated:

> In exchange for the Parties' performance under this
> Settlement Agreement, and other good and valuable
> consideration, the Parties for themselves, their
> members, owners, predecessors, successors and
> assigns hereby irrevocably, fully and forever
> releases the other Parties, their officers,
> directors, principals, employees, agents,
> representatives, attorneys-in-fact, attorneys-at-
> law, insurers, successors, and assigns from any and
> all claims, actions, causes of action, suits,
> losses, demands, sums of money, and expenses from
> any claims raised or that could have been raised in
> the Litigation.

(Doc. 21, Attach. 10 at 3.) On October 18, 2017, Plaintiff
filed its Notice of Voluntary Dismissal with Prejudice in
state court, dismissing the State Suit against Defendant and
Hartford. (Doc. 21, Attach. 11 at 2.)

On July 26, 2019, USACE notified Plaintiff of a warranty
claim based on problems with new sections of the concrete
sidewalks (the "2019 sidewalk claim").[5] (Doc. 26 at ¶ 30.)
Plaintiff contends that it considered the sidewalk sections
involved in the 2019 sidewalk claim to be "non-defective,
acceptable, and not requiring repair" in 2016 and 2017. (Id.
at ¶ 31.) After receiving the 2019 sidewalk claim, Plaintiff
contends that it investigated the defective sidewalk sections
and determined that the "buckling and shifting of the

---

[5] For reasons not clear to the Court, Plaintiff has not
provided the Court with any communication from the USCAE
regarding the 2019 sidewalk defects.

sidewalks at these new locations were caused by [Defendant's] Earthwork and Grading scope of work, the geotextile fabric, and installation defects." (Id. at ¶ 34.) Plaintiff notified Defendant of the 2019 sidewalk claim, and Defendant refused to repair the defective sections. (Id. at ¶¶ 35-36.) As a result, Plaintiff was forced to make the necessary repairs to the 2019 sidewalk sections. (Id.)

On July 16, 2020, Plaintiff instituted the current action against Defendant. (Doc. 1.) In its complaint, Plaintiff alleges that Defendant "breached the terms of the Subcontract by failing to properly perform its scope of work at the Project, causing defects in the sidewalks in certain areas of the Project." (Id. at ¶ 15.) Plaintiff seeks a judgment against Defendant for damages incurred as a result of Defendant's breach, together with interest, costs, and attorneys' fees. (Id. at ¶ 18.) Now, Defendant has moved for summary judgment on Plaintiff's claim. (Doc. 20.) For the following reasons, the Court finds Defendant's motion is due to be granted.

## STANDARD OF REVIEW

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows

10

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment).

Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553 (quotation omitted). The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citing Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)).

## ANALYSIS

Defendant argues that it is entitled to summary judgment on Plaintiff's breach of contract claim for two reasons. First, Defendant argues that Plaintiff's claim is precluded by

principles of res judicata. (Doc. 21 at 10.) Second, Defendant argues that Plaintiff's claim is barred as a matter of law by the Settlement Agreement. (Id. at 7.) In response, Plaintiff contends that res judicata does not apply because its claim in the current lawsuit and its claim in the State Suit are distinct causes of action dependent upon different operative facts. (Doc. 25 at 15.) Additionally, Plaintiff contends that it was impossible to raise the 2019 sidewalk claim in the State Suit, and therefore, the claim cannot be barred by either res judicata or contractual release. (Id. at 20-22.) Lastly, Plaintiff contends that the parties did not intend the Settlement Agreement to cover unknown claims such as the 2019 sidewalk claim. (Id. at 22-24.) For the following reasons, the Court finds Plaintiff's current claim for breach of contract is barred by res judicata and Defendant's motion for summary judgment is due to be granted.

## I.   RES JUDICATA

"The doctrine of res judicata promotes finality of judgments and prevents the re-litigation of claims." Gunby v. Simon, 277 Ga. 698, 699, 594 S.E.2d 342, 343 (2004). Res judicata bars claims that were previously litigated as well as "claims that could have been litigated in an earlier suit." Shurick v. Boeing Co., 623 F.3d 1114, 1116 (11th Cir. 2010). When a court is "asked to give res judicata effect to a state

court judgment, [the court] must apply the res judicata principles of the law of the state whose decision is set up as a bar to further litigation." Kizzire v. Baptist Health Sys., Inc., 441 F.3d 1306, 1308 (11th Cir. 2006) (quotation and emphasis omitted). Because Defendant contends a Georgia judgment bars this action, the res judicata principles of Georgia apply. Id.

Georgia has codified the principle of res judicata, providing that:

> A judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside.

O.C.G.A. § 9-12-40. The Georgia Supreme Court has held that res judicata will bar an action if three requirements are met – "(1) identity of the cause of action, (2) identity of the parties or their privies, and (3) previous adjudication on the merits by a court of competent jurisdiction." Coen v. CDC Software Corp., 304 Ga. 105, 105, 816 S.E.2d 670, 671 (2018) (citations omitted). In this case, the parties only dispute whether the first requirement for res judicata is met—whether

the State Suit and the present lawsuit embody identical causes of action.[6]

A "cause of action" is defined as being "the entire set of facts which give rise to an enforceable claim." Coen, 304 Ga. at 112, 816 S.E.2d at 675 (citing Morrison v. Morrison, 284 Ga. 112, 116, 663 S.E.2d 714, 719 (2008) (disapproved of on other grounds)). The essential question in determining the identity of a cause of action "is whether both claims arose from the same set of facts." Sweet City Landfill, LLC v. Lyon, 352 Ga. App. 824, 836, 835 S.E.2d 764, 776 (2019). A subsequent cause of action may arise from the same set of facts "even if some new factual allegations have been made or some new relief has been requested." Harrel v. Bank of Am., N. Am., 813 F. App'x 397, 401 (11th Cir. 2020) (internal quotation marks omitted) (quoting Dalton Paving & Constr., Inc. v. S. Green Constr. of Ga., Inc., 284 Ga. App. 506, 508, 643 S.E.2d 754, 756 (2007)). "In considering the 'entire set of facts,' we focus on the 'wrong' that is asserted." Coen,

---

[6] It is undisputed that Plaintiff and Defendant were both parties to the State Suit. Likewise, Plaintiff has not disputed Defendant's contention that the voluntary dismissal of the State Suit operated as a previous adjudication on the merits by a court of competent jurisdiction. (Doc. 21 at 11 (citing Fowler v. Vineyard, 261 Ga. 454, 456, 405 S.E.2d 678, 680 (1991) (concluding that a "voluntary dismissal with prejudice but without order of court should act as res judicata")).) Accordingly, the Court finds the first two requirements for res judicata are met.

304 Ga. at 105, 816 S.E.2d at 671 (citing City of Columbus v. Anglin, 120 Ga. 785, 791, 48 S.E. 318, 320-21 (1904)).

To distinguish its claims, Plaintiff attempts to make factual distinctions between the State Suit and the present action. Plaintiff presents the affidavit of its Vice President of Operations who testified that there was no overlap between the sections of sidewalk Plaintiff replaced in 2016 and the sections Plaintiff replaced in 2019. (Doc. 26 at ¶¶ 20, 36, 38; Doc. 26, Attach. 3 at 2-6; Doc. 26, Attach. 11 at 2.) Plaintiff's vice president also testified that Plaintiff considered the sections of sidewalk involved in the 2019 sidewalk claim to be non-defective at the time the Settlement Agreement was executed. (Doc. 26 at ¶ 31.) Additionally, Plaintiff asserts that the State Suit breach of contract claim arose from Defendant's failure to meet the thickness requirement for the concrete sidewalks whereas the current lawsuit stems from defects in the sandy select material, the geotextile fabric, and other installation flaws. (Doc. 25 at 19.) Because its current claim involves different sidewalk sections and new underlying defects, Plaintiff argues its cause of action in this lawsuit is not identical to the cause of action in the State Suit. (Id. at 20.)

Even assuming Plaintiff's current lawsuit presents novel factual allegations, Plaintiff is alleging the same wrong as

in the State Suit. See Anglin, 120 Ga. at 791, 48 S.E. at 320-
21. ("Different facts may be alleged, separately or
cumulatively, to show the same wrong; and the number and
variety of the facts alleged will not make more than one cause
of action, so long as but one wrong is shown."). In both cases
Plaintiff is alleging that Defendant failed to properly
perform its obligations under the Subcontract with respect to
the Project. Notably, both Plaintiff's current complaint and
complaint in the State Suit contain the identical allegation
that "[Defendant] breached the terms of the Subcontract by
failing to properly perform its scope of work at the Project
. . . ." (Doc. 1 at ¶ 15; Doc. 21, Attach. 9 at ¶ 12.)

Additionally, the record is clear that Plaintiff had
notice of the newly raised sidewalk defects prior to the
conclusion of the State Suit. The testing performed by
Whitaker Laboratory, Inc. revealed potential defects in both
the sandy select material and the geotextile fabric beneath
the sidewalks. (Doc. 21, Attach. 5 at 2-3.) Plaintiff also
noted potential problems with the installation method used for
the sidewalks in their July 2016 letter to Defendant's surety.
(Doc. 21, Attach. 7 at 2.) These defects, therefore, are part
of the entire set of facts giving rise to Plaintiff's breach
of contract claim in the State Suit. Accordingly, the Court
finds the causes of action in the State Suit and the current

17

suit are identical because they arise from the same set of operative facts, even if Plaintiff did not allege all the facts in the State Suit. See Dashtpeyma v. Walker, 859 S.E.2d 799, 803 (Ga. Ct. App. 2021) (citation omitted) ("It is the entire set of facts themselves, once they occur, however, that give rise to the cause of action, regardless of whether the party fails to include certain facts in the first action.").

Furthermore, "[r]es judicata acts as a procedural bar to claims that were raised **or could have been raised** in a prior action." Bryan Cnty. v. Yates Paving & Grading Co., 281 Ga. 361, 363, 638 S.E.2d 302, 304 (2006) (citations omitted) (emphasis added). "[I]t is only where the merits were not and could not have been determined under a proper presentation and management of the case that res judicata is not a viable defense." Piedmont Cotton Mills v. Woelper, 269 Ga. 109, 110, 498 S.E.2d 255, 256 (1998) (emphasis in original). Under the terms of the Subcontract, Defendant breached the agreement by failing "in any respect to perform and prosecute the Work properly and with promptness and diligence." (Doc. 26, Attach. 1 at 11.) Assuming that Plaintiff's allegations are true and that Defendant performed substandard work with respect to the defective sidewalk sections, Defendant breached the Subcontract when the sidewalk sections were installed. See Owen v. Mobley Constr. Co., 171 Ga. App. 462, 462, 320 S.E.2d

255, 256 (1984) (citing <u>Space Leasing Assocs. v. Atlantic Bldg. Sys., Inc.</u>, 144 Ga. App. 320, 324, 241 S.E.2d 438, 441 (1997)) ("[A]ny breach of contract based upon installation defects accrued when the building was substantially completed and the contract became due and payable."); <u>see also</u> <u>Smith v. KLS Constr. Co.</u>, 247 Ga. App. 493, 493, 544 S.E.2d 197, 198 (2001) (holding that breach of a construction contract occurs on the date the work was substantially completed). This is true even if Plaintiff had not yet suffered ascertainable damages from the breach. <u>Space Leasing</u>, 144 Ga. App. at 324, 241 S.E.2d at 441 (quotations and citations omitted) ("Under Georgia law, the statute of limitations runs from the time the contract is broken and not at the time the actual damages results or is ascertained.").

The record is clear that the 2019 sidewalk sections were installed before Plaintiff filed the State Suit. Therefore, the Court finds Plaintiff's current claim for breach of contract based on the 2019 sidewalk sections had accrued and could have been brought in the State Suit. <u>Gamble v. Lovett Sch.</u>, 180 Ga. App. 708, 709, 350 S.E.2d 311, 312 (1986) ("In contract actions the time of the breach controls, not the time the actual damages result or are ascertained.").

Perhaps recognizing that its claim is barred if it accrued prior to the Settlement Agreement, Plaintiff argues

that its claim based on the 2019 sidewalk sections was not viable at the time of the State Suit. (Doc. 25 at 20-22.) First, Plaintiff appears to argue that its claim did not accrue until it was forced to repair the sidewalks in 2019, and Plaintiff suffered an ascertainable injury, because the construction defect was in property owned by the USACE. (Id. at 20-21.) In making this argument, Plaintiff cites to Georgia Court of Appeal's decisions holding that a property owner's claim for negligent design and construction accrues at the time of injury, rather than substantial completion, when the claim is based on a construction defect in property owned by a third party. (Id. at 20 (citing Atlanta Gas Light Co. v. City of Atlanta, 160 Ga. App. 396, 398, 287 S.E.2d 229, 232 (1981); Travis Pruitt & Assocs., P.C. v. Bowling, 238 Ga. App. 225, 226, 518 S.E.2d 453, 454 (1999); Sewell Sales & Serv., Inc. v. Travelers Indem. of Am., 255 Ga. App. 531, 533, 566 S.E.2d 346, 349 (2002).)

The cases cited by Plaintiff all involve property owners bringing tort claims based on property damage suffered as a result of a construction defect present in property owned by a third party. See Atlanta Gas Light Co., 160 Ga. App. at 396-97, 286 S.E.2d at 231 (City of Atlanta's property was damaged when pumping station owned by utility company exploded); Travis Pruitt, 238 Ga. App. at 225, 518 S.E.2d at 452

20

(flooding to property caused by negligent design in a neighboring subdivision's drainage system); Sewell, 255 Ga. App. at 533, 566 S.E.2d at 349 (finding insurance companies' negligent construction claims accrued at time of injury if their subrogees did not own the wiring that caused fire damage to the property). In these circumstances, courts find that the property owner's negligent construction claim does not accrue under O.C.G.A. § 9-3-30 until the negligent design of the neighboring property causes damage to the property owner. See Travis Pruitt, 238 Ga. App. at 226, 518 S.E.2d at 454.

None of these cases, however, discuss the timing of accrual for a breach of contract claim. As stated previously, Georgia law is clear that a construction contract is breached at the time the construction is substantially completed. See Space Leasing, 144 Ga. App. at 324, 241 S.E.2d at 441; see also Costrini v. Hansen Architects, P.C., 247 Ga. App. 136, 137, 543 S.E.2d 760, 762 (2000) ("The period of limitation on a construction contract commences on the date the work was substantially complete."). As a result, unlike in the case of a property owner who has no relationship to a negligent designer of neighboring property, Plaintiff had the ability to sue Defendant for breach of the Subcontract from the moment of breach, despite the property being owned by the USACE. Accordingly, the Court rejects Plaintiff's argument that its

21

current breach of contract claim was not viable because the sidewalk sections were owned by a third party.[7]

Next, Plaintiff appears to argue that Defendant did not breach its express warranty under the subcontract until it refused to repair the 2019 sidewalk sections. (Doc. 25 at 21.) Plaintiff is correct that an "express warranty to repair is not breached until the warrantor refuses to repair or inadequately repairs the defect[.]" Feinour v. Ricker Co., 255 Ga. App. 651, 655, 566 S.E.2d 396, 398-99 (2002). Plaintiff, however, did not raise a breach of warranty claim in its complaint. As noted in Plaintiff's cited authority, Georgia courts "treat the start date for the breach of express warranty claim differently" than a normal breach of contract claim. Feinour, 255 Ga. App. at 653, 566 S.E.2d at 398 (2002); see also Space Leasing, 144 Ga. App. at 324-25, 241 S.E.2d at 441 (finding breach of contract claim accrued at the time of substantial completion while breach of express warranty claim may not have accrued until the defendant failed to make repairs).

---

[7] Notably, the cases Plaintiff cites only concern the application of O.C.G.A. § 9-3-30. See Travis Pruitt, 238 Ga. App. at 226, 518 S.E.2d at 454. Georgia courts have ruled that "the four-year statute of limitation in O.C.G.A. § 9-3-30 applies only to tort actions for damage to property. Actions arising out of contract do not fall within O.C.G.A. § 9-3-30's purview." Costrini, 247 Ga. App. at 137, 543 S.E.2d at 761-62 (quotation omitted).

In this case, Plaintiff only raised a breach of contract claim based on Defendant's failure to perform its scope of work under the Subcontract. As previously stated, this claim had accrued prior the resolution of the State Suit and, therefore, could have been litigated therein. Accordingly, the Court finds Plaintiff's current claim is barred by res judicata. As a result, Defendant's motion (Doc. 20) is **GRANTED**.

## II.   THE SETTLEMENT AGREEMENT

Alternatively, the Court finds that the Settlement Agreement bars Plaintiff's current claims. The Settlement Agreement is governed by Georgia law. (Doc. 21, Attach. 10 at 3 ("[T]his Settlement Agreement shall be governed by the Laws of the State of Georgia.").) Under Georgia law, "[a] release or settlement agreement is a contract subject to construction by the court." Darby v. Mathis, 212 Ga. App. 444, 444, 441 S.E.2d 905, 906 (1994) (quoting Hopkins v. Hopkins, 186 Ga. App. 530, 531, 367 S.E.2d 825, 826 (1988)). "The cardinal rule of construction is to determine the intention of the parties[.] But no construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation." Hopkins, 186 Ga. App. at 531, 367 S.E.2d at 826 (citations and quotations omitted). However, when the

terms of a settlement agreement are ambiguous regarding the parties' intent to bar future actions and cannot be adequately determined by the Court, the question of intent becomes a jury issue. See Tench v. Galaxy Appliance & Furniture Sales, Inc., 255 Ga. App. 829, 834, 567 S.E.2d 53, 59 (2002) (citing Vasche v. John Wieland Homes, Inc., 243 Ga. App. 178, 179-180, 530 S.E.2d 276, 278 (2000)).

Defendant argues that the language of the Settlement Agreement unambiguously bars Plaintiff's current suit. (Doc. 21 at 7.) Specifically, Defendant argues that Plaintiff's complaint is based on claims that were or could have been raised in the State Suit and that the Settlement Agreement explicitly covered such claims. (Id.) In response, Plaintiff contends that its breach of contract claim in the State Suit was based only upon the deficient concrete thickness, whereas its current breach of contract claim is based upon defects in the sandy select material, the geotextile fabric, and the installation process. (Doc. 25 at 14, 19, 24.) Plaintiff also contends that its current claim involves entirely different sections of the sidewalk than the State Suit. (Id. at 19.) Lastly, Plaintiff contends that it could not have raised its current claim in the State Suit because it was unaware that the additional sidewalk sections were defective until after the parties executed the Settlement Agreement. (Id. at 21-22.)

Looking to the language of the agreement, the Court finds that the Settlement Agreement unambiguously releases the parties "from any **claims raised or that could have been raised in the Litigation.**" (Doc. 21, Attach. 10 at 3 (emphasis added).) The Settlement Agreement defines "the Litigation" as the State Suit. (<u>Id.</u> at 2.) Accordingly, the relevant question is whether Plaintiff's current claim for breach of contract was raised or could have been raised in the State Suit. Because the Court has already determined that Plaintiff's current claim had accrued and could have been raised in the State Suit, Plaintiff's claim is barred by the Settlement Agreement.

Plaintiff argues that the Settlement Agreement cannot bar its claim based on the 2019 sidewalk sections because the claim was unknown at the time the Settlement Agreement was executed. (Doc. 25 at 22–23). Even assuming Plaintiff was unaware of the defects giving rise to the 2019 sidewalk claim, Georgia law allows parties to discharge liability for unknown claims as long the release clearly expresses that intent. <u>See</u> <u>U.S. Anchor Mfg. v. Rule Indus.</u>, 264 Ga. 295, 298, 443 S.E.2d 833, 835 (1994). The release in the Settlement Agreement applies to "any and all claims" "raised or that could have been raised in the Litigation." (Doc. 21, Attach. 10 at 3.) "Georgia courts have interpreted 'all claims' language to

include unknown conduct." <u>Watson v. Union Camp. Corp.</u>, 861 F. Supp. 1086, 1090 (S.D. Ga. 1994) (citing cases). Accordingly, the Court finds the release unambiguously discharged Defendant's liability for any claim that could have been raised in the State Suit, known or unknown. To hold otherwise would "impose upon unambiguous language a different meaning to comport with the drafter's claimed intent." <u>Id.</u> at 1089. Because Plaintiff's breach of contract claim is barred by the unambiguous terms of the Settlement Agreement, Defendant's motion (Doc. 20) is **GRANTED.**

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 20) is **GRANTED.**

SO ORDERED this $3/\frac{57}{}$ day of August 2021.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA